# Exhibit 3

September 6 Rough
Aaron Wallace Deposition
Transcript

ROUGH TRANSCRIPT

Page 1

1    REFLEX MEDIA VS. APIRILIACO LIMITED

2    ROUGH DRAFT DEPOSITION OF AARON WALLACE

3    TAKEN:  SEPTEMBER 6, 2020

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ROUGH TRANSCRIPT

```
 1          THE VIDEOGRAPHER:  We are on the video
 2   record, and the time is approximately 9:33 a.m.
 3   Today is September 6, 2020.  This is the start
 4   of video media disk number one of the video
 5   deposition of Aaron Wallace.  Please notice the
 6   microphones are very sensitive.  Be aware they
 7   can pick up whispering and conversations not
 8   intended for the record.  Additionally please
 9   turn off the cell phones or place them away from
10   microphones they can interfere.  Audio and video
11   recording will continue to take place unless all
12   patients agree to go off the record.  In the
13   matter of Reflex Media incorporated versus Aaron
14   Wallace an individual et al.  In the United
15   States district court district of Nevada.  Case
16   number 218CV02423RFVBNW.  This deposition is
17   being held at the courtyard by Marriott Hotel.
18   2051 south Le Jeune Road, Coral Gables, Florida.
19   My name is Richard Joe Hanson.  I'm the legal
20   video specialist from TSJ Reporting
21   headquartered at 228 east 4th street New York.
22   The court reporter is Theresa Rust also in
23   association with TSJ Reporting.  Would counsel
24   please introduce yourself and state whom you
25   represent starting with the notice of attorney
```

1      and then will the court reporter please swear

2      the witness in.

3          MR. SMITH:  Mark Smith on behalf of

4      plaintiff and I have with me Joseph Schaeffer

5      also on behalf of plaintiff and appearing

6      remotely is Isaac Eddington on behalf of

7      plaintiff.

8          ATTORNEY B:  Appearing for defendant

9      Nicolas Spigner for defendant Aaron Wallace.

10     THE WITNESS:  Aaron Wallace.  I do.

11  BY MR. SMITH:

12     Q.   Just a few ground rules that will be super

13  helpful although I'm not listen myself, but in

14  advance.  We can't talk over each other so if I ask a

15  question, please let me finish my question before you

16  start to talk.  Actually, in zoom complicates this

17  even more because it actually cuts people off.  The

18  court reporter I think is going to love that.

19  Listen, but we need to both speak I'll speak you'll

20  speak and then you'll speak.  She can't type what

21  both of us say.  Does that make sense.

22     Q.   Okay.  Thank you very much for the audible

23  response, especially with a mask on we're going to

24  need a audible response to everything.  So if I ask

25  you a question and you nod your head and it's hard

ROUGH TRANSCRIPT

1      Q.   Okay.  Do you still have any Capital One

2  accounts?

3      A.   Yes.

4      Q.   More than one?

5      A.   For personal?

6      Q.   For personal or business?

7      A.   I believe so.

8      Q.   How many personal accounts do you have?

9      A.   It's been a long time since I've used that

10  bank, but I believe maybe possibly personal checking

11  and a personal savings, but I could be wrong.  I just

12  said I could be wrong.  I'm not 100 percent sure.

13  There is no Capital Ones in I believe all of Florida.

14  No branches, at least.  So it's been a long time

15  since I've used that as a bank.

16      Q.   All right.  And how about as a business

17  accounts?

18      A.   I believe I possibly have one checking

19  account for business.

20      Q.   Were those accounts used for any other

21  businesses other than Money Respect?

22      A.   Those particular accounts would have never

23  been used for Money Respect.  What would they have

24  been used for.

25      A.   Personal and business.

ROUGH TRANSCRIPT

Page 52

1   what you did starting with the latter listen listen

2   formed as a company.  So for the next question will

3   be after the 2019 creation of inspire does Inspire

4   Uplift have its own bank accounts?

5        A.   Yes.

6        Q.   All right.  And prior to that and they used

7   a bank accounts prior to 2019 did it use the bank

8   accounts that Internet Income LLC used?

9        A.   Yes.

10       Q.   All right.  And then starting with the

11  Inspire Uplift accounts after 2019, where are those

12  accounts?  What banks?  What bank is that at?

13       A.   I'm sorry you said prior to what.

14       Q.   After the 2019 at what banks does Inspire

15  Uplift have accounts?

16       A.   Just Bank of America.

17       Q.   Okay.  And employer to 2019 it would have

18  been -- it was just the preexisting Internet Income

19  LLC accounts; is that right?

20       A.   Yes.

21       Q.   Okay.  Did Internet Income LLC still exist?

22       A.   Yes.

23       Q.   How long has that been around?

24       A.   I believe over ten years.

25       Q.   Any partners in Internet Income LLC?

ROUGH TRANSCRIPT

Page 53

1       A.   No.

2       Q.   Any other owners?

3       A.   No.

4       Q.   Where does it have bank accounts?

5       A.   Bank of America and Capital One, I believe.

6       Q.   Has it had accounts anywhere else

7   historically?

8       A.   I don't recall offhand.

9       Q.   What is Internet Income LLC do?  Let me

10  rephrase that.  What does it do now?

11      A.   Now it doesn't really do anything to be

12  honest.  I have credit lines with that company name.

13  What has it done?

14      Q.   So it's most recent operations, what did it

15  do?

16      A.   Affiliate marketing.

17      Q.   Anything else?

18      A.   I don't believe so.

19      Q.   And that's throughout its entire history?

20      A.   I may have used it for another retail

21  store.

22           MR. SMITH:  We can take a break in a few

23      minutes.  Just a couple of quick questions then

24      we're going to jump into another category.  I

25      think I've gone through three bottles of water

1     A.   I've done a lot of things in the last few

2  months.  I don't remember everything I do in the last

3  few months.

4     Q.   But you don't remember whether or not you

5  looked for any documents in response to discovery in

6  this case?  Let's go back to more general.  You got a

7  bunch of discovery requests in this case; correct?

8     A.   Yes, but I don't remember exactly you

9  included hundreds, I believe, of discovery requests

10  and questions.  I don't remember every single one.

11     Q.   I'm not asking you to I'm asking you did

12  you look for documents in response to those?

13     A.   Yes.

14     Q.   Where did you look?

15     A.   I don't recall specifically.  I've looked

16  bank records, you know, things that would be

17  relevant.

18     Q.   Which banks?

19     A.   Bank of America.

20     Q.   Any others?

21     A.   No because I don't actively use any other

22  banks.

23     Q.   What about for historical records, listen

24  his terror rale records; right?

25     A.   What do you mean by that?  Can you explain

1  Earlier you said you didn't want to talk about

2  predators watch because it's a current website.  I'm

3  not talking about the current version of predators

4  watch.  I'm talking about this 2013 version of

5  predators watch?

6          MR. SPIGNER:  Objection misstates prior

7      testimony.

8  BY MR. SMITH:

9      Q.   You have -- given that it matches your

10  website, do you recall this being one of your

11  websites?

12      A.   I don't recall.

13      Q.   Is it possible it was one of your websites?

14      A.   I don't recall.

15      Q.

16          MR. SMITH:  All right.  This is my Number

17      12.  Exhibit 12 was marked.  This is December

18      30, 2012 way back machine capture for potential

19      prostitutes FAQ page.  Can you take a look at

20      that.

21      Q.   I'm going to show you another page of the

22  FAQs for predators watch.

23          MR. SPIGNER:  Is a new exhibit being

24      introduced.

25          MR. SMITH:  This is it.

1          MR. SPIGNER:  Is this the Exhibit 13 we

2      were looking at.

3          MR. SMITH:  Same one I was just about to

4      get there.

5          MR. SPIGNER:  You're showing it without

6      producing it so just trying to make it clear on

7      my end.

8          MR. SMITH:  You got to let it up.  Let me

9      say some words.  Just relax.  This is a December

10      23, 2012 way back machine capture of predators

11      watch FAQ.  Go ahead and take a look at that.

12      Q.   We can go back and forth, but what I'm

13  pointing out is that these are virtually identical.

14  Does this help refresh your recollection that

15  predators watch --

16      A.   You broke up really bad at the end.  I'm

17  sorry.

18      Q.   I'm sorry.  I was moving around a little

19  bit too.  Does this help refresh your recollection

20  that predators watch was your site in 2013 time

21  frame?

22          MR. SPIGNER:  Objection.  Misstates prior

23      testimony.

24      A.   I don't recall.

25  BY MR. SMITH:

ROUGH TRANSCRIPT

1      Q.    We're going to go through a couple.  It's

2  actually kind of funny.  Says your name is Richard on

3  the bottom of your screen just so you know so if I

4  call you Richard at some point today, that's why?

5           THE WITNESS:  No worries.

6           MR. SPIGNER:  Can Yaseen that?  Is it

7      legible.

8           THE WITNESS:  It's difficult to read.

9           MR. SMITH:  So this is my number 14.  It's

10      a lab archive of the online watch of I don't

11      know the page.  I want to direct you down to

12      here we go.  We'll look at it in one second.

13      Just want to get you to the right page.  So do

14      Yaseen the highlight Facebook in that page.

15           THE WITNESS:  There's several.

16      Q.    That's true.  There are three.  Let's take

17  a look at all three.  Do you have a Facebook page or

18  did you have a Facebook page for the online watch?

19      A.    I don't recall.

20      Q.    But you owned the online watch in 2012;

21  correct?

22      A.    I believe so, but the URL, I just want to

23  make sure because the URL does have a dash in it and

24  yeah.  I believe so.

25      Q.    Okay.  Do you recall whether you had the

ROUGH TRANSCRIPT

1    online watch Facebook page?

2         A.   I don't recall.

3         Q.   What about there's a Twitter log that's

4    very similar so it's a social media account for the

5    online watch reference page.  Do Yaseen that?

6         A.   I see the Twitter link.

7         Q.   Okay.  And so keep that in mind for a

8    second.  We're going to go to another document.  This

9    is my number 15.  Exhibit 15.

10             MR. SPIGNER:  We have five minutes

11        remaining on the video.  I don't know if you

12        want to take a break now or.

13             MR. SMITH:  Thank you very much for letting

14        me know.

15             THE WITNESS:  If you can just put a pin in

16        the idea that you had the online watch Twitter

17        and Facebook references in the last document.

18        And we'll start on this document.  Does that

19        work?  Let's just take like a 10-15 minute break

20        real quick.  Everybody can use the restroom.

21             MR. SPIGNER:  Sure.

22             THE VIDEOGRAPHER:  I'm going to go off the

23        record at approximately 3:20 p.m.  that's going

24        to be the end of video disk number 3.

25             THE VIDEOGRAPHER:  I'm back on the record.

1          Q.    When you say you don't know, but I'm not

2     sure what you mean by it's impossible.  What do you

3     mean by that?  So do you know or is it impossible to

4     say?

5          A.    I don't know.

6          Q.    Okay.  I just want to make sure.  If you go

7     back to I asked you mental note mental pin on where

8     we were on the last document.  We're going to go down

9     to the predator watch document of the same page.  I

10    know those are difficult to read, but we'll get down

11    to it.  So this is my Exhibit 15.  It's the web

12    source code of the predators watch page.  And Joe

13    will get us down in the right spot.  One second.  If

14    you go to the two blue paragraphs in the middle and

15    take a look at those do Yaseen where it says

16    predators watch -- excuse me where Yaseen where it

17    says Facebook listen?

18         A.    Yes.

19         Q.    These references are actually pushing now

20    this is keep in mind this is predators watch.  These

21    are actually pushing to Facebook accounts and Twitter

22    accounts for the online watch.  Do Yaseen that?

23         A.    Yes, I see that.

24         Q.    Is that refresh your recollection that

25    predators watch may also be one of your websites

ROUGH TRANSCRIPT

1    since it's referring to the same social media

2    accounts as your other website online watch?

3         A.   I don't recall.

4         Q.   You don't have any reason to think at this

5    point do you have any reason to think predators watch

6    was not one of your websites during this time frame?

7         A.   In the code I see 2012.  It's eight or more

8    years ago possibly.  I don't recall.

9         Q.   Okay.  Listen /SHART?

10        A.   I don't recall.

11        Q.   Do you have any listen for cryptocurrency

12   accounts?

13        A.   Currently?

14        Q.   Yes.  We'll start with currently?

15        A.   I believe so, but I haven't accessed them

16   in some time.

17        Q.   Where do you maintain those accounts?  To

18   be fair, I know crypto can be maintained in a lot of

19   ways.  We can explore that.  Let's just start with

20   the general question, how do you maintain your

21   cryptocurrency account?

22        A.   I believe that I would purchase

23   cryptocurrency through Gemini and transfer crypto

24   currency to Orbitrix.

25        Q.   Just for cleaning up the record, Gemini is

ROUGH TRANSCRIPT

Page 174

 1    the world spelling Bittrex?

 2         A.    Bittrex.

 3         Q.    There you go.  You're right.  Have you ever

 4    had a coin based account?

 5         A.    I believe I have in the past.

 6         Q.    Did you ever use coin base for Exposing

 7    Johns?

 8         A.    I don't recall.

 9         Q.    Do you recall using it for any of the oh

10    sites like Exposing Johns that you owned?

11         A.    I don't recall.

12         Q.    Anyone from predator alert?

13         A.

14         Q.    Do you know whether -- I'm going to go back

15    to the predator alert sites I talked about earlier.

16    Remember there was four of them I'm just going to

17    refer to all of the same in time as Predator Alert

18    sites.  Do you know whether any of those uses.

19    Cryptocurrency takes cryptocurrency as a form of

20    /#35EU789?

21         A.    Can you please -- I just want to make sure.

22    You mean the active sites right now; right.

23         Q.    Yes.  Those?

24         A.    I don't know.

25         Q.    When was the last time you had a coin based

1  account?

2      A.   Is estimates fine?

3      Q.   Yes.  Let me step back.  Do you still have

4  a coin base account?

5      A.   To be honest, I don't know offhand.  If I

6  do, it's one that I haven't accessed in years

7  probably.  I'm not 100 percent sure.

8      Q.   Did you ever pay Mr. Achille using

9  cryptocurrency?

10     A.   I don't recall.

11     Q.   Do you recall him ever paying you using

12  crypto?

13     A.   I just don't recall.

14     Q.   Do you know when you opened up your coin

15  based account?

16     A.   Roughly is okay?  Estimate?

17     Q.   Yes, sure.  Thank you?

18     A.   I believe it was maybe even as much as like

19  nine or ten years ago.  I think coin base was very

20  flu at the time.

21     Q.   Why did you -- why did you stop using coin

22  base?

23     A.   I don't recall.

24     Q.   Did you go through your look for coin base

25  records in response to any of the discovery you

1    so it's difficult.

2         Q.   So did you do anything.  I understand, but

3    did you do anything to actually preserve documents?

4    Did you set out to make sure for example if you had

5    an e-mail like a Gmail account, and that Gmail

6    account after a certain period of time.

7    Automatically deletes anything older than listen

8    years.  Did you do anything to stop any of that from

9    happening?

10        A.   No, but I don't know if the G mail that I

11   used at the time, you know, anything that would be in

12   there, I haven't accessed in years.  I don't have

13   access to the G mail, and I don't know if I can even

14   recover the G mail.  I don't know.

15        Q.   What e-mail addresses did you use to look

16   for listen in this case?

17        A.   I don't have access to those e-mails any

18   longer.

19        Q.   When you say those e-mails, what do you

20   mean?

21        A.   Like if I would have had a support at

22   domain.com e-mail for instance would have obviously

23   expired a long time ago.

24        Q.   So when you look for documents in this

25   case, can you give me a list of e-mail addresses that

1    you looked through?

2        A.   I don't have access to the e-mail

3    addresses.

4        Q.   Which ones did you actually look in.

5    That's what I'm getting a lot.  If you didn't have

6    access to others, which ones did you look at?

7        A.   I don't recall.  I don't have any e-mails

8    to look through for these documents.

9        Q.   So you didn't look anywhere?

10       A.   You mean in e-mails?

11       Q.   You didn't look in any e-mail for

12   documents?

13       A.   I no longer have access to the e-mails.

14       Q.   Did you check your fish master account, for

15   example?

16       A.   I did not check it specifically.  I do

17   believe that I logged in.  I saw on the subpoena that

18   I logged in.  I want to say a year ago or two years

19   ago, probably.  But I don't remember what -- I think

20   I unforwarded the e-mail or something like that.  It

21   wasn't anything to like -- it gets a lot of spam.

22   Hundreds of thousands of spam I believe.  It's a

23   useless e-mail.

24       Q.   So where did you look for documents then?

25   You physically looked in your -- whatever records you

1    keep.  What physical records did you look at?

2         A.   Documents in my possession would be

3    possibly Bank of America bank records.

4         Q.   Those?

5         A.   I'm sorry what was that.

6         Q.   Did you turn those over?  Did you produce

7    those?

8         A.   I believe so.

9         Q.   Did you turn them over to counsel?

10        A.   I'm not sure.

11        Q.   Did you look for any other records?  Did

12   you find anything else?

13        A.   I did not find anything else.

14        Q.   Then how long after -- where did you check

15   online for the records?

16        A.   Well, I don't have access to those e-mail

17   accounts anymore so I cannot log into those e-mails

18   to check those e-mails.  So it's difficult.

19        Q.   Capital One, did you try the account at

20   Capital One?

21        A.   I do not remember the last time I logged

22   into Capital One offhand.

23        Q.   What about stripe?  Did you try to log into

24   stripe?

25        A.   We recently created a stripe.

1      Q.   What about stripe records, did you try to

2  find any of those?

3      A.   I do not have access to those accounts.

4      Q.   Did you try to regain access?

5      A.   I don't have access to the e-mail accounts

6  that those would be created with.

7      Q.   Did you reach out to stripe to get your

8  records access listen?

9      A.   No.

10      Q.   I think we already covered inaudible.  Go

11  to did you reach out to any of the cryptocurrency

12  companies for your records in response to this case?

13      A.   No.

14      Q.   Where do you keep Daniel Achille's contact

15  information?

16      A.   I believe it might be in my phone address

17  book, but I'm not sure.

18      Q.   Did you look through your phone for records

19  in response to the document request in this case?

20      A.   It's a new phone.  I transfer my address

21  book from phone to phone.  It doesn't transfer any

22  documents or anything.

23      Q.   What about text messages?  Does it transfer

24  those?

25      A.   Not from that long ago.  I don't have text

ROUGH TRANSCRIPT

1    Q.   How do you know Brett Thompson?

2    A.   I met him here in Miami maybe five, six

3   years ago and possibly even longer than that.

4    Q.   Does he work with you?

5    A.   Does or did?  I'm sorry.

6    Q.   Has he ever?

7    A.   I believe we worked together, but it was

8   many years ago.  I don't remember the specifics.

9    Q.   Do you know what he did for you?

10    A.   I don't recall.

11    Q.

12    Q.   Did he work on any listen Exposing Johns or

13   any of the sites like it?

14    A.   I'm sorry.  I'm not going to answer that

15   question.  How you worded it was incredibly

16   inappropriate, I believe.

17    Q.   What was inappropriate?

18    A.   I don't know.

19    Q.   Okay.  Did he work on Exposing Johns or any

20   of the sites like it?

21    A.   I don't recall.

22    Q.   What about Adam Thompson?

23    A.   Can you go into more detail.

24    Q.   Do you know Adam Thompson?

25    A.   Yes.

ROUGH TRANSCRIPT

1  know if you guys are requesting one on your

2  side.  We are closing the deposition.  And have

3  nothing else to ask or add at this point.  So

4  unless they have stuff like the court reporter

5  sometimes will ask us questions about reading

6  and signing and some other things so I'm going

7  to let them take over and get out of the way.

8  Do you guys have anything you want to add.

9       THE VIDEOGRAPHER:  That's going to be the

10  end of the deposition.  This is five video disk

11  the time is approximately 5:44 p.m.  I'm going

12  to go off the record.  I'm off.

13

14

15

16

17

18

19

20

21

22

23

24

25